UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 5:21-cr-014-DCR-MAS-1 |
| | ) | |
| RANDOLPH A. MORRIS, | ) | **REPORT & RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

Before the Court is Defendant Randolph A. Morris's ("Morris") omnibus motion seeking: (1) suppression of various statements allegedly made to law enforcement agents on September 12, 2018; (2) dismissal of Counts 1 through 3 of the Indictment due to numerous claimed legal deficiencies; and (3) disclosure of grand jury minutes detailing the information reviewed by the grand jury prior to his indictment. [DE 20].[1] Having thoroughly considered the evidence of record and the parties' arguments, the Court recommends denial of the motion in full.

## I.    FACTUAL & PROCEDURAL BACKGROUND

### A.    THE CURRENT CHARGES

The Indictment alleges that Morris engaged in a scheme to defraud the Kentucky Department of Revenue by failing to report income earned as a professional basketball player for the Beijing Ducks ("Ducks") in the Chinese Basketball Association ("CBA") during the years 2015 through 2017. [DE 1]. During his tenure with the Ducks from 2010 through 2018, Morris

---

[1] The fourth relief request, for a trial continuance, has already been resolved by Chief Judge Reeves. [DE 23]. The trial in this matter is set for September 14, 2021.

earned more than $13 million in salary and bonuses.  However, despite establishing Kentucky residency in December 2010, the Government alleges that Morris omitted his Ducks income from 2015, 2016, and 2017 Kentucky tax returns (KY Form 740) submitted via H&R Block's online tax preparation platform.  Because the returns were transmitted interstate from an H&R Block server in Lenexa, Kansas to a Kentucky Department of Revenue server in Frankfort, Kentucky, the United States charges Morris with three violations of the wire fraud statute, 18 U.S.C. § 1343, for the 2015-17 years.  [DE 1, Counts 1-3].

The Government also charges Morris with eight counts of making materially false statements on federal tax documents, in violation of 26 U.S.C. § 7206(1).  [Counts 4-11].  Morris declared under penalty of perjury that his federal returns (IRS Forms 1040 and 1040A) for the years 2011 through 2018 were true and correct.  However, per the Indictment, Morris's returns for those years reported no earned foreign income despite Morris's substantial income with the Ducks.

## B.    SEPTEMBER 12TH INTERVIEW

The focus of the suppression motion concerns an interview of Morris conducted by Special Agent Jeff Laber ("SA Laber") with the IRS, Criminal Investigations Division as well as IRS Special Agent Gordon Amegboh ("SA Amegboh") that occurred on September 12, 2018.  During an evidentiary hearing held in response to the motions, SA Laber detailed the meeting.  [DE 27 (Minutes); DE 30 (Tr.) at 3–4].

On the morning of September 12, SA Laber and SA Amegboh traveled to Morris's Lexington, Kentucky residence to speak with him, but found that no one was home.  [*Id.* at 6].  SA Laber and SA Amegboh placed a business card on the front door and left, travelling to a nearby restaurant or coffee shop to attempt to call Morris's cellphone.  [*Id.*].

Shortly after leaving a voicemail for Morris on his cellphone, SA Laber received a text message from Morris stating that he was out of the country for the next three or four months trying

2

out for a basketball team.  [*Id.* at 8].  SA Laber responded to the text with his email address, suggesting that he and Morris exchange email addresses and communicate that way. [*Id.*].  Morris immediately sent SA Laber an email and, as SA Laber was preparing to respond to that email, Morris called SA Laber's cellphone.  [*Id.*].  When SA Laber answered the call, Morris stated that his wife, Andrea Morris ("Mrs. Morris"), had advised Morris that the agents wanted to speak with him.  Morris suggested that they return to his residence where Morris could call his wife via an audio/video application (such as Zoom, Duo, or FaceTime) and speak to the agents.  [*Id.* at 8–9].  SA Laber asked Morris to check with his wife before the agents returned to the residence, and SA Laber and Morris then ended their call.  [*Id.* at 9].  Soon after, Morris texted SA Laber advising, "Yes, this will work."  [*Id.*].  SA Laber then told Morris that he would be at the residence in roughly thirty minutes, at about 11:30 a.m.  [*Id.*].

Upon arriving at Morris's residence at the agreed time, the agents identified themselves to Mrs. Morris, displayed their credentials, and were invited into the home.  [*Id*. at 10].  The trio exchanged casual pleasantries as they walked from the entryway to the kitchen area.  [*Id.*].  With Mrs. Morris standing on one side of the kitchen island and the agents on the other, she called Morris and propped the phone up facing the agents.  [*Id.*].  SA Laber testified that he was able to clearly see and hear Morris on the video call, and there was no delay or lag.  [*Id.* at 11].

It is undisputed that neither agent read Morris his *Miranda*[2] rights.  SA Laber described the interview of Morris that followed as "business-like" and "cordial," and he testified that Morris gave appropriate and detailed answers.  [*Id.* at 14].  While Mrs. Morris voluntarily remained in the kitchen during the bulk of the interview, her freedom of movement was in no way restrained and she was not asked or forced to remain in the area.  [*Id.*].  Morris never requested that questioning

_____

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

cease and that there were no threats, displays of weapons, or raised voices during the entirety of the video call.

About halfway through the video call, the connection cut out and the video froze. [*Id.* at 15-17]. All parties realized the connection had dropped at that time, and the interview momentarily paused. After Morris exchanged messages with his wife, Mrs. Morris confirmed she could not re-establish the video connection. Consequently, she suggested the parties could use the audio-only version of the application. [*Id.*]. The agents agreed to continue with only audio, and SA Laber testified that the remainder of the phone call was clear, and all parties could hear one another and communicate effectively. Toward the end of the call, when SA Laber perceived that Morris was having difficulty clearly remembering some details, SA Laber advised that Morris did not have to answer any question if he did not want to or did not know the answer to it. But if Morris did provide an answer, it had to be a truthful response as a false statement could constitute a crime. [*Id.* at 13].

In total, the interview lasted approximately eighty minutes, and the agents left Morris's residence following its conclusion. [*Id.* at 17].

## II.    MOTION TO SUPPRESS

Morris maintains that any statements he made during the September 12, 2018 interview must be suppressed because (1) they were taken in violation of *Miranda*; (2) they were involuntary; and (3) they are unreliable. The Court addresses each argument below.

### A.    MORRIS'S SEPTEMBER 12, 2018 STATEMENTS DID NOT VIOLATE *MIRANDA*.

The Fifth Amendment precludes an individual from being "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To help safeguard this right, the Supreme Court enacted the familiar prophylactic rule outlined in *Miranda*: "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may

be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. at 444. The *Miranda* rule applies only to custodial interrogations—*i.e.*, "questioning by a law enforcement officer after a person has been taken into custody or otherwise deprived of his freedom of action in a significant way." *Maranian v. Jackson*, 14 F. App'x 310, 313 (6th Cir. 2001). In this case, the Government does not dispute that Morris was subject to interrogation. The central issue, rather, is whether Morris was "in custody" for *Miranda* purposes at the time of the questioning. Based on the totality of circumstances present, the Court concludes that Morris was not in custody on September 12.

"A suspect is in custody if, under the totality of the circumstances, a reasonable person would not feel free to end the interrogation by the police and leave." *United States v. Hoyer*, 411 F. Supp. 3d 406, 408 (W.D. Ky. 2019). Interrogation includes both express questioning, as well as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response[.]" *Id.* at 409 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). The Court considers several factors in assessing the nature of challenged questioning,

> including (1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions.

*United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010).

To start, Morris was not in the same building—or even the same country or continent—as SA Laber and SA Amegboh. Though courts have, in some instances, found the circumstances surrounding a telephone interview so restrictive that the situation became custodial, no such restrictive circumstances were present here. Morris primarily relies upon *United States v. Adoni-Pena*, No. 1:09-CR-28, 2009 WL 3568488, at *1 (D. Vt. Oct. 23, 2009), and *United States v.*

*Arango-Chairez*, 875 F. Supp. 609, 612 (D. Neb. 1994), *aff'd*, 66 F.3d 330 (8th Cir. 1995), to establish that telephone questioning may rise to the level of a custodial interrogation in some instances. But the circumstances of those cases are readily distinguishable. In *Adoni-Pena*, the defendant had been transported to a police station and placed in an interview room there prior to questioning, and an officer escorted him from the interview room to a nearby telephone within the station to speak with a particular investigative agent. 2009 WL 3568488, at *5. Thus, Adoni-Pena's movement was restricted by the escorting officer throughout, and there was no indication that Adoni-Pena voluntarily elected to place or engage with the telephone call. The telephone conversation in *Arango-Chairez* likewise took place in a prison environment. There, the court found that Arango-Chairez was in custody during the call because, among other things, it was "clear that defendant did not initiate contact with [the questioning officer] and did not voluntarily acquiesce to respond." 875 F. Supp. at 615. The court concluded that this and several other factors "contributed to a police-dominated environment[,]" which transformed the call into a custodial interrogation. *Id.*

Morris was not incarcerated or in an inherently restrained environment. In stark contrast, Morris invited the agents to his home to conduct the call. Then, in conjunction with his wife, Morris took the steps to initiate the call. The record indicates that Morris was entirely alone in his hotel room in a foreign country at the time of the call. Any reasonable person in his position would have felt at liberty to simply end the conversation or to ask the agents to leave his home.[3] [*See* Tr.

---

[3] Morris argues, and the Court agrees, that even an interview in a familiar setting such as the suspect's home *may* be custodial if the surrounding circumstances are sufficiently restrictive. *See, e.g.*, *United States v. Pacheco-Lopez*, 531 F.3d 420, 425 (6th Cir. 2008). Yet, Morris supplies no authority deeming an interview custodial where it occurs telephonically with the agents at the suspect's home, but with the defendant alone at a separate, remote location. It is simply relevant to note that questioning occurring in a comfortable, non-police-dominated setting—such as the

at 8–9 (SA Laber testifying that Morris invited the agents back to his residence, that he asked Morris to check with Mrs. Morris before returning to the home, and that Morris responded shortly after that it would be fine)].

Nor did SA Laber or SA Amegboh engage in any threatening or intimidating conduct toward Morris or his wife. The men were dressed in normal business suits with their weapons fully concealed throughout the encounter. [*Id.* at 5–6]. SA Laber described the conversation as cordial and business-like [*id.* at 14], and Morris has not alleged that the agents raised their voices or made any threats. SA Laber further affirmed that, though Mrs. Morris voluntarily remained in the kitchen (near her cellphone) during the call, her movement was not restricted. Moreover, it is undisputed that Morris had complete freedom of movement in his hotel room in China. Ultimately, in contrast with the defendants in *Adoni-Pena* and *Arango-Chairez*, the totality of the facts weighs heavily in favor of a noncustodial finding. *See, e.g.*, *United States v. Kearney*, 791 F. Supp. 2d 602, 603 (E.D. Ky. 2011) (finding that the defendant was not in custody during a telephonic interrogation where—even despite being incarcerated on other charges at the time—the defendant "placed the call on his own initiative[,] . . . [and] was free to terminate the phone conversation at any time"); *Tawfeq Saleh v. Fleming*, 512 F.3d 548, 551 (9th Cir. 2008) (finding that the defendant was not in custody where, though incarcerated at the time on a separate case, he initiated the phone

---

defendant's home—is typically considered non-custodial, absent other restrictions on the defendant's freedom. *See United States v. Panak*, 552 F.3d 462, 466–67 (6th Cir. 2009) (explaining that at-home questioning "often" will not arise to a custodial encounter for *Miranda* purposes given the "inherently comfortable and familiar environment," but that it may become custodial based on, *inter alia*, "[t]he number of officers, the show of authority, [and] the conspicuous display of drawn weapons"). Ultimately, the at-home-questioning line of cases is distinguishable and of little persuasive value given the significant situational differences here, and those at-home-questioning cases that have found the defendant in custody for *Miranda* purposes are even more attenuated from the scenario at hand.

conversation with the investigating agent and "could have terminated the phone call he had begun at any time").

The sole consideration favoring a custodial finding is the agents' failure to expressly advise Morris that he did not have to speak with them at the outset of the conversation. *Cf. Coomer v. Yukins*, 533 F.3d 477, 487 (6th Cir. 2008) (acknowledging that "perhaps most significantly" the officer had advised the defendant "several times that she was not under arrest and that the police would leave if asked"). "However, this is only one of several factors to consider, and it is not dispositive." *United States v. Levenderis*, 806 F.3d 390, 401 (6th Cir. 2015) (concluding that, "[i]n light of the surrounding circumstances, including the familiar setting, defendant's ability to make and receive calls, the fact that agents never told defendant he was *not* free to leave, and the absence of any other indicia of coerciveness, this factor alone does not transform an otherwise non-custodial setting into a custodial one"). The circumstances preceding Morris's interview made it implicitly clear that Morris did not have to speak with the agents. Indeed, SA Laber had asked Morris to obtain permission from his wife before they returned to the residence for the call. Additionally, SA Laber did inform Morris toward the end of the conversation that he did not have to answer any questions that he did not want to answer or that he did not know the answers to. [Tr. at 13]. That Morris did not immediately end the conversation at that point supports the conclusion that he was voluntarily participating in it throughout.

Based on the totality of the circumstances on September 12th, an objectively reasonable individual in Morris's position would have felt entirely free to end the interaction with the agents at any point. Accordingly, Morris was not in custody for *Miranda* purposes, and there is no

8

*Miranda* violation here to remedy.[4]  The Court recommends that the District Judge deny suppression of Morris's September 12 statements to law enforcement.

**B.    MORRIS'S STATEMENTS DID NOT VIOLATE THE FIFTH AMENDMENT.**

Morris also contends that any incriminating statements made on September 12, 2018, were involuntary, precluding their use under the Fifth Amendment.  Morris argues that his statements were involuntary because of his anxiety about the agents' presence in his home with Mrs. Morris while he was away, Morris's jet lag, and the late time in China at the time the interview occurred.  The Court rejects these arguments.

For statements "to be involuntary and therefore procured in violation of the Fifth Amendment, 'coercive police activity' must have preceded [them]."  *United States v. Hunter*, 332 F. App'x 285, 288 (6th Cir. 2009) (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)).  A finding of involuntariness requires that "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement."  *Id.* at 288–89.  The Court must adopt a totality of the circumstances approach, considering such factors as

> the age of the accused, his level of education and intelligence, his physical condition and emotional state at the time of the confession, his expressed fears of violent reprisals, actual physical punishment, the proximity of the coerciveness of the confession as given, and the inherent coerciveness of the confession as given.

*Id.* at 289.

---

[4] Though Morris suggests that an IRS policy regarding agents' reading of *Miranda* rights supports finding a *Miranda* violation in this case [*see* Tr. at 18], such a policy offers no independent, substantive protection to Morris beyond that afforded by the Constitution, applicable statutes, and governing case law.  *See United States v. McKee*, 192 F.3d 535, 540 (6th Cir. 1999). And, as discussed, the relevant cases interpreting *Miranda* here compel a non-custodial finding.

If a defendant asserts that his statement or confession was involuntary, the Government bears the burden of proving that it was voluntary by a preponderance of the evidence. *Id.* The Government has satisfied that burden here. Critically, none of the three *Connelly* factors is present. The police conduct was objectively *non*-coercive on September 12, 2018, based on all relevant circumstances. The officers left the residence immediately upon learning that Morris was not home, and they returned only on Morris's express invitation. Further, Morris represented to the agents that he had confirmed with his wife that it was appropriate for them to return to the home to call him before they did so. The time was pre-planned and mutually agreed upon, undermining Morris's argument that he was anxious about the agents' unexpected presence at home with Mrs. Morris during the interview. Morris's conduct and the undisputed events preceding the interview directly contradict the assertion. Nor did SA Laber or SA Amegboh make any threats to Morris or his wife or employ any otherwise intimidating strategies to encourage Morris's statements. At no point did Morris express fear of reprisal or other consequences if he chose not to speak with the agents.

Moreover, contrary to Morris's speculative contention, there is no concrete proof indicating that Morris was actually suffering from jet lag at the time or meaningfully debilitated as a result of the late hour in China.[5] During the interview, Morris never expressed feelings of tiredness or disorientation, and SA Laber did not mention observing Morris to be sleepy or unresponsive during the call. *See Muniz v. Johnson*, 132 F.3d 214, 220 (5th Cir. 1998) (rejecting the defendant's fatigue argument and finding no coercion where, despite the interview occurring in the very early morning after a late-night arrest, there was "nothing in the record to suggest that he complained to the

---

[5] The interview occurred between approximately 11:30 p.m. and 1:00 a.m. in Morris's time zone in China.

officers about his fatigue; that he requested additional time to rest; or that the officers conditioned additional rest time on receiving his confession"). Further, Morris did not complain about the duration of the interview (approximately eighty minutes) or request any breaks. *See also United States v. Moser*, 235 F. App'x 138, 141–42 (4th Cir. 2007) (finding the interview duration reasonable and the statements voluntary where the defendant spent nearly nine hours with the agents in total and was questioned for more than three hours at a time, but never indicated tiredness or reluctance to continue the interview).

Taken together, there is simply no evidence in the record to establish objectively coercive conduct on the part of SA Laber or SA Amegboh. And there is no evidence establishing that any coercive conduct overcame Morris's will and played a crucial role in Morris's decision to speak with the agents. Without these elements, there can be no finding of involuntariness. Rather, the record establishes a finding, by a preponderance of the available evidence, that any statements Morris made on September 12, 2018 to SA Laber and SA Amegboh were entirely voluntary. Because no Fifth Amendment violation occurred, the Court recommends that the District Judge also deny suppression on this basis.

## C. THE STATEMENTS SHOULD NOT BE SUPPRESSED AS UNRELIABLE OR UNCORROBORATED.

Lastly, Morris claims that the statements he made to the agents on September 12, 2018 should be suppressed because they were unreliable. He cites connection issues during the call and purported jet lag. However, with the Court having already found the statements voluntarily made as a matter of law, the gravamen of Morris's reliability argument goes only toward the statements' evidentiary weight. It is, thus, a question for the jury, not grounds to suppress the challenged statements. The Supreme Court has explained

> that the circumstances surrounding the taking of a confession can be highly relevant to two separate inquiries, one legal and one factual. The manner in which a

11

> statement was extracted is, of course, relevant to the purely legal question of its voluntariness . . . But the physical and psychological environment that yielded the confession can also be of substantial relevance to the ultimate factual issue of the defendant's guilt or innocence.

*Crane v. Kentucky*, 476 U.S. 683, 688–89 (1986) (citation omitted); *accord Lego v. Twomey*, 404 U.S. 477, 485–86 (1972); *see also Sturm v. Darnell*, No. 2:10-CV-00247, 2012 WL 220211, at *25–26 (S.D. Ohio Jan. 25, 2012), *report and recommendation adopted*, No. 2:10-CV-00247, 2012 WL 604229 (S.D. Ohio Feb. 24, 2012), *aff'd sub nom. Sturm v. Superintendent of Indian River Juv. Corr. Facility*, 514 F. App'x 618 (6th Cir. 2013).

To the extent Morris seeks a pretrial, legal ruling on the statements' admissibility on a reliability basis, he is simply reprising his earlier voluntariness argument, one which the Court thoroughly addressed above.  Nevertheless, Morris is free to present at trial his reliability theories, and the jury can assess the circumstances to determine any statements' credibility and ultimate probative value.  *See Crane*, 476 U.S. at 689 ("[R]egardless of whether the defendant marshaled the same evidence earlier in support of an unsuccessful motion to suppress, and entirely independent of any question of voluntariness, a defendant's case may stand or fall on his ability to convince the jury that the manner in which the confession was obtained casts doubt on its credibility.").  Regardless, this factual issue is not properly resolved pretrial.  The Court recommends that the District Judge deny suppression on the argued reliability bases.

The Court must also address the corroboration question.  Although the parties' briefly reference corroboration in the briefing, the discussion from both sides is general and untethered to any specific statements' content or substance, or to any particularized and available extrinsic evidence.  [*See, e.g.*, DE 25, at Page ID # 132].  Morris simply casts the entire September 12 conversation as broadly uncorroborated based on the circumstances of the calls (namely, the asserted connection issues), without discussing the content of the at-issue statements.  Nor has the

United States definitively established that Morris's September 12 admissions *are* sufficiently corroborated to be admissible.[6]    Though the United States represents that independent, corroborating extrinsic evidence exists (*i.e.*, from Morris's bank and tax records, from other witnesses, etc.), that evidence is not before the Court on this record.  Without the extrinsic evidence before it, the Court cannot—in the abstract and at this stage—discern whether Morris's statements are or are not adequately corroborated by independent proof.  The Court recommends that the District Judge deny suppression based on any argued lack of corroboration.[7]

### III.    MOTION TO DISMISS

Parties may raise by pretrial motion "any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b). "Generally, motions are capable of determination before trial if they raise questions of law rather than fact." *United States v. Jones*, 542 F.2d 661, 664 (6th Cir. 1976). "Thus, a defense is capable of determination if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense." *Id.* (quotation marks omitted).  Further, the Court is "not limited to the face of the indictment in ruling on the motion to dismiss[,]" as "Rule 12 vest[s] the court with authority 'to determine issues of fact in such a manner as the court deems appropriate.'"  *United States v. Levin*, 973 F.2d 463, 467 (6th Cir. 1992) (quoting *Jones*, 542 F. 2d at 665).

---

[6] "The Supreme Court has recognized that the government must introduce independent evidence to establish the trustworthiness of a defendant's statement." *United States v. Trombley*, 733 F.2d 35, 37 (6th Cir. 1984).  There must "be extrinsic evidence corroborating the admission as a whole which, taken together with the admission, is sufficient to support a finding of guilt beyond a reasonable doubt[,]" and "[i]f there is extrinsic evidence tending to corroborate the confession, the confession as a whole is admissible[.]" *Id.*

[7] Morris does not advance any arguments regarding, and the Court does not address, the potential admissibility of the September 12 statements under the Federal Rules of Evidence.

Broadly, Morris asserts five challenges to Counts 1 through 3 of the Indictment ("Wire Fraud Counts"): (1) abstention principles compel the Court to refrain from adjudicating cases involving the collection of state taxes; (2) the allegations against Morris fall outside of the scope of § 1343; (3) the prosecution should be dismissed as a violation of internal Department of Justice ("DOJ") policy; (4) the application of § 1343 to offenses involving state tax collection contravenes constitutional and federalism interests; and (5) the Wire Fraud Counts fail to properly allege an offense.

The Court confronts each argument in turn.

## A.    ABSTENTION DOCTRINES DO NOT APPLY.

The judicially crafted concept of abstention "is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it[.]" *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976) (quoting *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188–189 (1959)). Courts generally recognize four abstention doctrine variants. *See Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496 (1941); *Younger v. Harris*, 401 U.S. 37 (1971); *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943); *Colorado River*, 424 U.S. at 800. Morris argues general abstention should prevent the current prosecution, but fails to specify the abstention doctrine or doctrines at issue. However, as detailed below, none of the abstention doctrines (or their underlying policy rationales) pertain to the circumstances of Morris's wire fraud prosecution.

First, *Pullman*-type abstention counsels federal courts to defer jurisdiction on constitutional issues where resolution of overlapping "state law question[s] might obviate the need for decision of the federal question[.]" *Muskegon Theatres, Inc. v. City of Muskegon*, 507 F.2d 199, 204 (6th Cir. 1974). The sort of abstention outlined in the *Pullman* line of cases is inapplicable, as this prosecution presents no "federal constitutional issue which might be mooted

14

or presented in a different posture by a state court determination of pertinent state law[.] *Colorado River*, 424 U.S. at 814 (quoting *Allegheny Cty.*, 360 U.S. at 189). Resolution of the Wire Fraud Counts is a matter of statutory, not constitutional, dimension. And, in any event, a jury's assessment of whether Morris's conduct violated the federal wire fraud statute would not be mooted or shaped by any conceivable state law determination.

Second, *Younger*-type abstention "derives from a desire to prevent federal courts from interfering with the functions of state criminal prosecutions and to preserve equity and comity." *Doe v. Univ. of Kentucky*, 860 F.3d 365, 368 (6th Cir. 2017). In short, *Younger* abstention too is inapt. The doctrine applies to federal cases presenting constitutional questions entwined with state criminal prosecutions, to civil enforcement proceedings, "and even to civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions[.]" *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 368 (1989). If a case fits within one of these categories, the federal court may decline jurisdiction "when three criteria are met: (1) state proceedings are currently pending; (2) the proceedings involve an important state interest; and (3) the state proceedings will provide the federal plaintiff with an adequate opportunity to raise his constitutional claims[.]" *Doe*, 860 F.3d at 369. Critically, the absence of any parallel, pending state proceedings is fatal to Morris's bid for *Younger* abstention.

Third, *Burford*-type abstention applies where federal review of state issues "would have [ ] an impermissibly disruptive effect on state policy[.]" *Colorado River*, 424 U.S. at 815; *see also Vulcan Materials Co. v. City of Tehuacana*, 238 F.3d 382, 390 (5th Cir. 2001) (characterizing *Burford* abstention as aiming "to avoid needless conflict with the administration by a state of its own affairs"). This case does not involve any questions of state law, much less unsettled ones,

15

and "[n]o questions bearing on state policy are presented for decision." *Colorado River*, 424 U.S. at 815. Nor would a decision as to federal criminal liability on the Wire Fraud Counts here influence or impede any Kentucky efforts to enforce and implement its own tax policy. Though Morris contends that any issues surrounding state tax payment are "more appropriately" handled by Kentucky, nothing presented in this federal case would impair Kentucky's ability to take its own criminal, civil, or administrative action concerning Morris's income taxes.[8] Withholding jurisdiction in this case is unwarranted and improper on *Burford* grounds.

Finally, *Colorado River*-type abstention seeks "to avoid duplicative litigation[.]" *Id.*; *Colorado River*, 424 U.S. at 819 (considering the efficiency and appropriateness of exercising simultaneous jurisdiction in "concurrent *federal* proceedings") (emphasis added). Again, there are no concurrent proceedings regarding Morris's tax payments generally or the Wire Fraud Counts specifically. Thus, there is no risk of piecemeal or duplicative litigation concerning them. Though Morris insinuates that *Colorado River* reiterates the Supreme Court's holding "that federal courts should abstain from hearing cases, among others, involving the 'collection of state taxes[,]'" [DE 20-1, at Page ID # 87], the case in fact confirms that such abstention is permissible only where "federal jurisdiction has been invoked *for the purpose of restraining*" state tax collection or state criminal or other proceedings. 424 U.S. at 816 (emphasis added). There is no such restraint attempt at issue here.

---

[8] The Court can conceive of a theoretical scenario where, if Morris is convicted of Counts 1 through 3, the inherent finding that Morris fraudulently underpaid Kentucky taxes could conflict with Kentucky's position, if the Commonwealth were to decide that Morris did not in fact owe or underpay any state income taxes. However, "the mere potential for conflict in the results of adjudications, does not, without more, warrant staying exercise of federal jurisdiction." *Id.* at 816. Such a result in the federal case, even if incongruent with the state's ultimate position or action, would in no way tie Kentucky's hands in determining whether and how to enforce its own tax laws.

16

Morris's generic reliance upon *United States v. State of Ohio*, 614 F.2d 101, 104 (6th Cir. 1979), is misplaced.   Indeed, the case involved state tax proceedings, but the facts are distinguishable from the instant case.   In *Ohio*, the United States filed a declaratory judgment action seeking a determination that state taxes assessed by the Ohio Tax Commissioner were unlawful under Ohio law.   614 F.2d at 102.   Simultaneously, proceedings against the same defendant and challenging the same taxes (but brought by different plaintiffs) were pending before the Ohio Board of Tax Appeals.   *Id.* at 103.   Relying on a mixture of *Pullman* and *Younger* abstention jurisprudence, the Sixth Circuit found that the United States could adequately raise its arguments (both under state law and the Constitution) in the state administrative forum, and that "the interest of [Ohio] in administering [its] own laws, as well as in deciding constitutional questions, would be unnecessarily hampered by federal judicial proceedings[.]" *Id.* at 105.   The Court reversed the district court's stay of the Ohio tax proceedings and directed the district court to abstain from exercising federal jurisdiction.

The only meaningful parallel between *Ohio* and this case is the peripheral involvement of state taxes.   Once more, unlike in *Ohio*, there is no pending state proceedings regarding the same subject matter as the federal case.   The current case has no chance of interfering with Kentucky's administration of its own laws.   Simply because state taxes are referenced in *Ohio* does not transform the case into relevant or persuasive guidance.

Generally, abstention from federal jurisdiction is not justified in this case.   The Court recommends that the District Judge decline to dismiss on abstention grounds.

**B.    THE ALLEGATIONS AGAINST MORRIS ARE CONSTITUTIONAL AND WITHIN THE SCOPE OF § 1343.**

Morris argues that applying § 1343 to schemes to defraud state governments is an unconstitutional overreach of federal power and not within Congress's Commerce Clause

authority.  Consequently, according to Morris, the at-issue activity is reserved to the states to regulate under the Tenth Amendment.  Even if constitutional, Morris further contends that the actual conduct alleged here is nonetheless outside of the statute's scope.  The Court disagrees with both arguments.

### 1.    Constitutionality

The Commerce Clause vests in the federal government the power "[t]o regulate commerce with foreign nations, and among the several states[.]"  U.S. Const. art. I, § 8, cl. 3.  Under the Tenth Amendment, any matters not within Congress's purview are expressly left to the states to regulate. U.S. Const. amend. X.  The wire fraud statute, originally enacted in 1956, has the following elements: "(1) a scheme or artifice to defraud; (2) use of interstate wire communications in furtherance of the scheme; and (3) intent to deprive a victim of money or property."  *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003) (quoting *United States v. Prince*, 214 F.3d 740, 747– 48 (6th Cir.2000) (footnote omitted)).[9]

Morris does not argue that Congress lacked authority, generally, to enact § 1343 or that the statute is facially unconstitutional.  [DE 26, at Page ID # 154].  Instead, he contends that the statute is unconstitutional as applied in this scenario because the victim at issue is a state actor.

However, the victim of the crime is not the focus of § 1343 or the Commerce Clause.  The Commerce Clause strictly limits Congress's ability to regulate intrastate conduct.  Accordingly, the wire fraud statute explicitly includes a required "interstate nexus" element to invoke federal jurisdiction.  *United States v. Lindemann*, 85 F.3d 1232, 1241 (7th Cir. 1996).  Critically, the

---

[9] The wire fraud statute mirrors its 1872-enacted predecessor, the mail fraud statute, 18 U.S.C. § 1341.  The Sixth Circuit "has interpreted the mail-fraud and wire-fraud statutes as having essentially the same elements, except for the use of the mails versus the wires."  *United States v. Kennedy*, 714 F.3d 951, 958 (6th Cir. 2013).  Courts apply the same substantive legal analysis to both statutes, and the Court references mail and wire fraud cases interchangeably in its discussion.

jurisdictional hook and key aspect of § 1343 prosecutions is the use of wires itself, *not* the substance or nature (or victim) of the fraudulent scheme driving that use.  The statute does not, by its terms, require that the conduct comprising or underlying the fraudulent scheme itself be an interstate activity.  Morris's argument conflates the jurisdictional aspect inherent in the second element—wire use—with the independent first element—the underlying fraudulent scheme.

The cases cited by Morris confirm as much.  In each example, the statutes lacked an actual interstate commerce offense element and relied upon speculative interstate commerce impediments as their justification.  *See United States v. Lopez*, 514 U.S. 549, 551 (1995) (invalidating the Gun-Free School Zones Act of 1990 as exceeding Congress's Commerce Clause power because the Act "neither regulate[d] a commercial activity nor contain[ed] a requirement that the possession be connected in any way to interstate commerce"); *United States v. Morrison*, 529 U.S. 598, 617 (2000) (invalidating portions of the Violence Against Women Act that targeted only a nebulous "aggregate effect on interstate commerce" and lacked any direct tie to interstate commerce channels); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 588 (2012) (finding the Affordable Care Act's individual mandate provision unauthorized by the Commerce Clause because its connection to interstate commerce—punishing those who did *not* engage in it, to avoid prospective aggregate effects—was too remote).  These cases were not about the victims or targets of the statutory action.  Unlike those overturned statutes, Section 1343 has an express jurisdictional element directly and unquestionably linking the statute to a channel of interstate commerce (wires, *e.g.*, the internet).

The cases Morris cites further confirm that chief evil targeted by § 1343 is fraudulent interstate wire use, no matter whether the fraud scheme itself is interstate or commercial in character.  For example, in *United States v. DeFiore*, 720 F.2d 757 (2d Cir. 1983), the Second

Circuit upheld a federal wire fraud conviction based on the defendant's scheme to defraud New York of state taxes. Morris attempts to distinguish *DeFiore* by emphasizing the interstate nature of DeFiore's cigarette business and contrasting it with Morris's non-interstate Kentucky tax issues. However, neither the interstate nor the commercial nature of DeFiore's cigarette business was relevant to the Second Circuit's analysis. DeFiore argued, like Morris, that § 1343 was not intended to reach state tax fraud schemes. The Second Circuit, in dismissing DeFiore's argument, sided with four other circuits and concluded that § 1343 "squarely applie[s] . . . to state tax law violations." *DeFiore*, 720 F.2d at 761. "Section 1343 on its face [was] not limited in the manner suggested by DeFiore." *Id.* Moreover, the court underscored that the wire fraud statute "plainly applies to '*any* scheme or artifice to defraud' in which the jurisdictional means—the wires—are employed. **Its focus is upon the misuse of the wires, not the regulation of state affairs**." *Id.* (italicized emphasis in original, bold emphasis added). Federal jurisdiction hinged on wire transmission, not the fraudulent scheme.

Other courts have applied the same rationale. The Fourth Circuit upheld use of § 1341 to prosecute a scheme to defraud Florida of state sales and use taxes. *United States v. Brewer*, 528 F.2d 492, 494–95 (4th Cir. 1975). Similarly, the Eighth Circuit affirmed a mail fraud conviction in the precise scenario this case presents—a state tax fraud scheme. The Court explained:

> Appellant argues that the application of § 1341 in this case is an impermissible intrusion into state affairs. However, the fact that the underlying fraud here may violate state law does not exclude it from the proscription of the mail fraud statute. Appellant's contention is premised upon a basic misinterpretation of the rationale behind the mail fraud statute. This court recently stated, 'the focus of the statute is upon the misuse of the Postal Service, not the regulation of state affairs, and Congress clearly has the authority to regulate such misuse of the mails.' . . . [P]rinciples of federalism do not provide a basis for reversal.

*United States v. Mirabile*, 503 F.2d 1065, 1066–67 (8th Cir. 1974) (citations omitted); *see also United States v. Flaxman*, 495 F.2d 344, 349 (7th Cir. 1974) (upholding mail fraud conviction in

20

the context of a state sales tax fraud scheme and observing that "[j]ust because the State of Illinois was the victim and makes such a scheme illegal does not preclude the Federal Government from prosecuting the perpetrators under an applicable federal law").

The Court recognizes that one case from the Southern District of New York has adopted Morris's position. *See United States v. Henderson*, 386 F. Supp. 1048 (S.D.N.Y. 1974). The *Henderson* court granted the defendant's request to dismiss § 1341 counts premised on fraudulent federal tax returns transmitted via the postal mail, concluding that it was "of the view that the statute does not include within its proscription a scheme to defraud the Internal Revenue Service in the collection of income taxes." 386 F. Supp. at 1053. This view stemmed in substantial part from the Court's characterization of the statute's purpose as primarily combatting "schemes of a type designed to defraud members of the community at large[.]" *Id.* This is contrary to the Supreme Court's own interpretation of the legislative intent behind § 1341 enactment (and, as a corollary in the wire context, § 1343). The Supreme Court explained in 1896 that § 1341's central "purpose was 'to prevent the post office from being used to carry [fraudulent schemes] into effect[.]'" *Parr v. United States*, 363 U.S. 370, 389 (1960) (quoting *Durland v. United States*, 161 U.S. 306, 314 (1896)). Accordingly, as the later *Parr* Court clarified, "[t]he fact that a scheme may violate state laws does not exclude it from the proscriptions of the federal mail fraud statute[.]" *Id. Henderson* is nonbinding, contradicts Supreme Court perception of relevant legislative intent, and is inconsistent with the plain text of both §§ 1341 and 1343. The Court finds it unpersuasive.[10] *See also DeFiore*, 720 F.2d at 761 (likewise rejecting *Henderson*).

---

[10] As a secondary basis for dismissing the mail fraud counts, the *Henderson* court emphasized that "Congress has enacted legislation [other than § 1341] that affords adequate protection of the public interest in the collection of [federal] income taxes." 386 F. Supp. at 1053. That logic obviously has no application here, as the United States has no avenue for enforcing state tax collection, even if it wanted to do so.

Consistent with the plain language of § 1343 and the near unanimity of case law, all the Government must show is that Morris transmitted information by means of wires in interstate commerce for the purpose of executing *any* fraudulent scheme. The Indictment alleges these elements, averring that Morris caused interstate wire signals to be transmitted via the internet, for the purpose of defrauding Kentucky of state income taxes. Thus, the Indictment alleges interstate wire transmission properly within Congress's Commerce Clause authority.[11]

### 2. __Statutory Scope__

Next, the Court addresses Morris's argument that his alleged conduct falls outside of § 1343's reach because the wire involvement was not sufficiently integral to the fraud scheme. The Court finds no authority predicating § 1343 invocation on any minimum or threshold level of such use. In fact, courts have found even the simplest, most "routine or innocent" interstate transmission sufficient to establish the second statutory element. *See United States v. Tencer*, 107 F.3d 1120, 1125 (5th Cir. 1997) (finding the mailing of a single check sufficient to carry a mail fraud count); *see also United States v. Hoffman*, 901 F.3d 523, 546 (5th Cir. 2018), *as revised* (Aug. 28, 2018) (characterizing a single "interstate email" as sufficient); *id.* at 546 n.12 (observing that "[w]ith today's rampant use of email and other technology that often crosses state lines, it will usually not be hard to identify scores of wires that further a scheme"); *United States v. Drummond*, 255 F. App'x 60, 64 (6th Cir. 2007) (concluding that airline reservations made over the internet, between servers in different states, were sufficient); *United States v. Selby*, 557 F.3d 968, 979 (9th

---

[11] Having found that § 1343 is neither unconstitutional nor adverse to dual sovereignty, the Court declines to further countenance dismissal based on any personal policy views Morris urges. Even if the Court agreed that this federal prosecution were not the most prudent or economical use of the United States's resources and that the fraud conduct itself could be adequately addressed at the state level, it would not provide a legal basis for dismissing Counts 1 through 3. Congress has authority to regulate interstate wire use in this context, and the Court may not wield the tool of dismissal to commandeer the United States' prosecutorial choices on subjective policy grounds.

Cir. 2009) (finding that forwarding a single email was "sufficient to establish the element of the use of the wires in furtherance of the scheme"). The wire transmission need be only "a 'step in the plot[,]'" *United States v. Lo*, 231 F.3d 471, 478 (9th Cir. 2000), *holding modified by United States v. Larson*, 495 F.3d 1094 (9th Cir. 2007) (quoting *Schmuck v. United States*, 489 U.S. 705, 711 (1989)), and minimally "*incident* to an essential part of the scheme," *id.* (emphasis in original).

The Sixth Circuit recently reaffirmed and explained this low jurisdictional bar in the context of the analytically identical mail fraud statute. *See United States v. Black*, 819 F. App'x 309 (6th Cir. 2020). Like the cases cited above, the Sixth Circuit concluded that the mailing simply must somehow aid or further the fraudulent scheme. *Id.* at 314. By way of illustration, the Sixth Circuit compared two cases: *United States v. Ramer*, 883 F.3d 659, 684 (6th Cir. 2018), and *United States v. Hartsel*, 199 F.3d 812, 818 (6th Cir. 1999). *See Black*, 819 F. App'x at 314. *Ramer* involved an investment fraud scheme in which the mail element was satisfied by mailings between an oil facility owned by the fraudsters and a state government entity. The Court found that, while the mailings were lawful and not directly part of the fraud, they indirectly aided the fraud. In contrast, in *Hartsel*, the mail at issue was an automatic bank statement sent to account holders, but there was no evidence that the defendants ever used or referenced the mailed statement in any manner. Thus, the conviction was overturned because the Court found that the mail use in no way furthered the fraudulent scheme.

Turning back to *Black*, there, a trustee fraudulently accessed and misused trust money. Black was required to post a bond to access the trust funds, and the mail element was satisfied by the mere mailing of a bond renewal invoice to Black. The Sixth Circuit upheld the defendant's mail fraud conviction, finding the case closer to *Ramer* than to *Hartsel*. *Black*, 819 F. App'x at 314–15. Per the Sixth Circuit, a rational jury could conclude that Black could not have continued

23

accessing the funds without receiving the renewal notice and posting the required bond, and that Black "caused" the renewal to be mailed to him by requesting the bond in the first place.

Morris's case presents a scenario more like *Ramer* and *Black* than *Hartsel*. The United States alleged that Morris completed, signed, and submitted the fraudulent returns—the key instrument facilitating the scheme—via the internet, *i.e.*, interstate wire transmissions. Accepting all factual allegations in the Indictment as true, as the Court must at the dismissal stage, a rational jury could surely find that Morris "caused" transmission of the wire signals when he submitted the online returns, and that this conduct aided and was essential to the fraud scheme. Indeed, without submission of the returns containing allegedly false statements, the fraud could not have occurred. Thus, the alleged conduct is clearly within the § 1343 scope, and it should be a jury's duty to decide whether the evidence presented supports the allegations and satisfies the relevant statutory elements. Judicial dismissal is unwarranted, and the Court recommends that the District Judge deny the request on these grounds.[12]

## C.   INTERNAL DOJ POLICY DOES NOT WARRANT DISMISSAL.

Morris next argues that this prosecution contravenes internal DOJ and IRS policy. Specifically, Morris references Tax Division Directive No. 128, which provides in part:

> Tax Division approval is required for any criminal charge if the conduct at issue arises under the internal revenue laws, regardless of the criminal statute(s) used to charge the defendant. Tax Division authorization is required before charging mail fraud, wire fraud or bank fraud alone or as the predicate to a RICO or money laundering charge for any conduct arising under the internal revenue laws, including any charge based on the submission of a document or information to the

---

[12] To the extent Morris suggests the Court may lack jurisdiction over the case because it inadequately demonstrates the "interstate commerce" element, the Court disagrees. Morris's argument essentially challenges the sufficiency of the evidence on the wire element—an issue reserved for the jury. *See Black*, 819 F. App'x at 315 ("The government properly invokes this jurisdiction when it files an indictment charging a defendant with a violation of a federal criminal law, even if it later turns out the government lacks sufficient evidence for a conviction . . . And a claim that the government failed to prove an element of the crime—like the use-of-the-mails element in Black's case—raises a merits challenge, not a jurisdictional one.") (citation omitted).

IRS. Tax Division approval also is required for any charge based on a state tax violation if the case involves parallel federal tax violations.

The Tax Division may approve mail fraud, wire fraud or bank fraud charges in tax-related cases involving schemes to defraud the government or other persons if there was a large fraud loss or a substantial pattern of conduct and there is a significant benefit to bringing the charges instead of or in addition to Title 26 violations . . . Absent unusual circumstances, however, the Tax Division will not approve mail or wire fraud charges in cases involving only one person's tax liability, or when all submissions to the IRS were truthful.

The United States Department of Justice Archives, *Tax Division Directive No. 128*, https://www.justice.gov/archives/usam/tax-resource-manual-14-tax-division-directive-no-128. A faithful reading of the policy directive as a whole clearly demonstrates that it is intended to apply only to individual DOJ attorneys' internal permission to levy mail, wire, and bank fraud charges arising out of tax-related schemes. The policy requires attorneys to obtain approval from the Tax Division, within the same DOJ umbrella as the United States Attorney's Office, before bringing such charges premised on federal tax violations. It likewise requires approval for charges based on state tax violations, *if* the state violations comprise conduct that is also a federal tax violation.[13]

Even assuming the policy governs the instant case, the United States does not appear to have violated it in this instance. Though the policy confirms the Tax Division's reticence to approve criminal charges based on one individual's tax liability, it notes that the Tax Division may nonetheless do so if "unusual circumstances" are present. The policy directive further provides considerations relevant to the approval decision but stops short of defining or limiting what sort of "unusual circumstances" must justify fraud charges. The Court cannot conclude that such circumstances, in the DOJ and Tax Division's view, were not present in this case, or that the instant charges were indeed brought in violation of this policy.

---

[13] The record suggests that this is the case here, as Counts 9 through 11 are premised on Morris's alleged failure to federally declare his foreign income during the same years at issue in Counts 1 through 3.

In any event, and as is dispositive of this argument, even an unequivocal DOJ policy violation would not support dismissal of Counts 1 through 3. Tax Division Directive No. 128 is not a constitutional or statutory requirement and, like other internal DOJ policies, it "confers no rights upon the accused[.]" *United States v. Renfro*, 620 F.2d 569, 574 (6th Cir. 1980). Even where "a policy [is] internally enforced by the DOJ," a defendant may "not invoke that policy to bar a criminal prosecution." *Convertino v. U.S. Dep't of Just.*, 795 F.3d 587, 597 (6th Cir. 2015); *see also United States v. Caceres*, 440 U.S. 741, 754 (1979) (declining to judicially enforce agency regulations). Still, Morris insists that "because the Government has failed to remedy this violation" of internal DOJ policy, the Court should provide the sought relief. [DE 26, at Page ID # 156]. But it is not the Court's place to do so, as "[t]he decision of whether or not to prosecute . . . is a decision firmly committed by the [C]onstitution to the [E]xecutive [B]ranch of the government." *United States v. Clemons*, No. 3:08-CR-102, 2010 WL 670110, at *3 (E.D. Tenn. Feb. 22, 2010). "[I]ntervention by the court in the internal affairs of the Justice Department would clearly constitute a violation of the Separation of Powers Doctrine." *Renfro*, 620 F.2d at 574.

The Court recommends that the District Judge reject this dismissal argument as well.

## D. THE INDICTMENT'S ALLEGATIONS ARE SUFFICIENT.

Finally, Morris argues that the Indictment does not properly allege the wire fraud elements afford him sufficient notice of the averments against him. Specifically, Morris contends that the Indictment fails to allege the third statutory element: that Morris harbored "intent to deprive a victim of money or property." *Daniel*, 329 F.3d at 485. According to Morris, because the Indictment does not specify the actual amount of taxes paid to Kentucky during the 2015, 2016, and 2017 years, the possibility exists that Morris could have overpaid Kentucky taxes. Morris posits that the existence of this possibility demonstrates that the Indictment fails to sufficiently allege intent. The Court disagrees.

26

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation[.]" U.S. Const. amend VI. To that end, Rule 7 provides that each "indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged[.]" Fed. R. Crim. P. 7(c)(1); *see also Russell v. United States*, 369 U.S. 749, 762 (1962). "An indictment is sufficient if it (1) contains the elements of the charged offense, (2) gives the defendant adequate notice of the charges, and (3) protects the defendant against double jeopardy." *United States v. Rankin*, 929 F.3d 399, 404–05 (6th Cir. 2019) (quotation marks omitted); *see also Hamling v. United States*, 418 U.S. 87, 117 (1974). The express language of the statute may be referenced in describing the charges and their elements, "but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific [offense], coming under the general description, with which he is charged." *Hamling*, 418 U.S. at 117–18.

Morris essentially argues that the Indictment here does not describe the charges factually in a manner that gives adequate notice of all offense elements. However, the text of the Indictment squarely refutes Morris's contention that it leaves open the potential for any Kentucky tax overpayment that may negate the required intent to deprive. The Indictment specifically alleges that Morris "understood that by falsely representing his income to the Kentucky Department of Revenue, he was depriving that department of information that, had it been provided, *would have resulted in his owning substantially more money in taxes to the state of Kentucky*." [DE 1, at Page ID # 4 (emphasis added)]. In other words, the Indictment expressly avers that Morris knew that he falsely represented his income and that doing so would deprive Kentucky of the ability to assess Morris "substantially more money in taxes[.]" This paragraph—particularly in the context of the

full Indictment—fairly alleges that Morris intended to and knew that he was depriving Kentucky of tax money as a result of his fraud scheme.

Accordingly, the United States clearly "assert[s] facts which in law constitute an offense; and which, if proved, would establish prima facie the defendant's commission of" wire fraud. *United States v. Superior Growers Supply, Inc.*, 982 F.2d 173, 177 (6th Cir. 1992). The Indictment provides Morris ample notice of the charges and supporting factual allegations against him, and it sufficiently alleges the Wire Fraud Counts. The Court recommends that the District Judge find the Indictment sufficient as to the Wire Fraud Counts and deny Morris's request for dismissal on this basis.

## IV.    MOTION FOR DISCLOSURE OF GRAND JURY MATERIALS

Lastly, and as directly related to Morris's Indictment sufficiency argument addressed in Section III, Part D, *supra*, Morris also requests disclosure of the grand jury minutes pertaining to his Indictment. He contends the minutes are necessary to establish whether the grand jury, in fact, received evidence concerning the total amount of taxes Morris paid to Kentucky insofar as such information could have negated any alleged intent to deprive inherent in Counts 1 through 3.

Per Rule 6, "[t]he court may authorize disclosure . . . of a grand-jury matter . . . at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury[.]" Fed. R. Crim. P. 6(e)(3)(E)(ii). Grand jury proceedings are appropriately cloaked with a presumption of secrecy, and disclosure of grand jury materials may only be ordered upon a showing of "compelling necessity". Even then, the veil of secrecy may only be "lifted discretely and limitedly" as tailored to address the "particularized need" demonstrated. *United States v. Procter & Gamble Co.*, 356 U.S. 677, 683 (1958).

Morris has shown no such compelling necessity here. His speculation that the grand jury may not have heard evidence of the total taxes paid to Kentucky falls far short of evincing a

potential ground to dismiss the Indictment, as Rule 6 requires. The Indictment properly alleges that Morris intended to deprive Kentucky of tax money for the reasons already discussed. The grand jury found probable cause to support these allegations and the wire fraud charges, and Morris has not asserted or shown any concrete defects in the grand jury process to undermine the probable cause determination. A hypothetical scenario theorizing evidence that *may*, were it even to exist, negate an essential offense element does not demonstrate a compelling need for grand jury transcript or minutes disclosure.

Critically, defendants are not entitled to review and second-guess a grand jury's probable cause determination. *See United States v. Smith*, No. CR 6:13-34-KKC, 2020 WL 3469103, at *4 (E.D. Ky. June 23, 2020), *certificate of appealability denied*, No. 20-5976, 2021 WL 688868 (6th Cir. Jan. 6, 2021) (collecting numerous cases reiterating the well-established principle that indictments are not subject to challenge on the ground that there was inadequate or incomplete evidence before the grand jury). Relatedly, a defendant surely may not compel disclosure of grand jury materials in pursuit of a fishing expedition seeking to uncover hypothetical evidence that could be used to develop an Indictment challenge that Morris is not even permitted to bring. Morris has not shown any compelling, or even legitimately permissible, reason for disclosure. The Court recommends that the District Judge deny this request and decline to order disclosure of the grand jury materials.

## V.  <u>CONCLUSION</u>

For the reasons thoroughly discussed and outlined, the Court **RECOMMENDS** that the District Judge **DENY** all three components of Morris's Omnibus Motion [DE 20] (the Motion to Suppress, the Motion to Dismiss, and the Motion for Disclosure of Grand Jury Materials). The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of the statute. **Within fourteen days** after being

served with a copy of this recommended decision, any party may serve and file written objections to any or all portions for consideration, *de novo*, by the District Court.

Entered this the 23rd day of July, 2021.



Signed By:
Matthew A. Stinnett
United States Magistrate Judge