UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) Criminal Action No. 5: 21-014-DCR |
| V. | ) |
| RANDOLPH MORRIS, | ) **MEMORANDUM OPINION** |
| | ) **AND ORDER** |
| Defendant. | ) |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Defendant Randolph Morris is charged with engaging in a scheme to defraud the Kentucky Department of Revenue by failing to report income earned as a professional basketball player in China during the years 2015 through 2017.[1] The matter is pending for consideration of Morris's "omnibus motion" in which he seeks the following relief: suppression of any statements Morris made to IRS agents during an interview on September 12, 2018; dismissal of Counts 1 through 3 based on abstention principles, Department of Justice policy, and public policy; dismissal of Counts 1 through 3 as constitutionally defective for failure to properly allege an offense; and disclosure of grand jury minutes.

United States Magistrate Judge Matthew A. Stinnett conducted an evidentiary hearing on May 19, 2021. On July 23, 2021, he issued a Report and Recommendation ("R&R") recommending that Morris's motion be denied in full. Morris then filed objections to the

---

[1]    The fraudulent scheme, in violation of 18 U.S.C. § 1343, is charged in Counts 1 through 3. Morris is also charged in Counts 4 through 11 with making false statements on federal tax forms in 2010 through 2017, in violation of 26 U.S.C. § 7206(1).

R&R.[2] Following careful review, the Court will adopt the Magistrate Judge's findings and recommendations. The defendant's motion will be denied.

## I.

Defendant Morris was the subject of a criminal investigation regarding his income taxes in September 2018. [Record No. 30, p. 5] Internal Revenue Service Special Agents Jeff Laber and Gordon Amegboh drove to Morris's residence in Lexington, Kentucky the morning of September 12, 2018, in an attempt to interview him as part of their investigation. No one was home and the agents left a business card on the front door.

Laber and Amegboh drove to a restaurant about 20 minutes away and called Morris's cell phone. Shortly after leaving a voicemail, Laber received a text message from Morris stating that he was out of the country trying out for a basketball team and that he would remain out of the country for three or four months. *Id.* p. 8. Laber texted Morris his email address, to which Morris responded with an email message. As Laber was preparing to reply to Morris's email, Morris called Laber. Morris told Laber he had spoken with his wife Andrea and had heard the agents stopped by their residence. Morris stated that he knew the agents wanted to speak to him and suggested they could do so by going back to his residence and have his wife call him using Facetime. Laber advised Morris to check with his wife and make sure this plan was okay with her. Laber received a text message from Morris shortly thereafter that indicated

---

[2]   Although this Court must make a *de novo* determination of those portions of the Magistrate Judge's recommendations to which timely objections are made, 28 U.S.C. § 636(b)(1)(C), "[i]t does not appear that Congress intended to require district court review of a magistrate's factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings." *Thomas v. Arn*, 474 U.S. 140, 150 (1985).

"yes, this will work." Laber told Morris that the agents would be there around 11:30 a.m., which was in approximately thirty minutes.

The agents drove back to the residence where the defendant's wife was waiting on the porch. The agents identified themselves and she invited them in. The group went into the kitchen where Andrea remained on one side of the counter and the two agents on the other. Andrea made contact with the defendant on her cell phone and propped it up on the countertop so that it was facing away from her and toward the agents so that they could see the defendant and he could see them. They then proceeded with the interview.

The call dropped about halfway through the interview. According to Laber, the image stopped moving and the audio "just stopped and cut out." The Morrises reestablished their phone call but determined that they would not be able to continue with the audio-video format. Instead, they continued with an audio only format using speakerphone. *Id.* p. 16. There were no delays or further technical problems from that point. The interview lasted about an hour and 20 minutes in total.

II.

A.  **Motion to Suppress**

Morris argues that the statements he made to agents on September 12, 2018, were elicited in violation of his Fifth Amendment right against self-incrimination. Specifically, he contends that the interview constituted a custodial interrogation and he was not given warnings as required under *United States v. Miranda*, 384 U.S. 436, 444 (1966). The government concedes that Morris's questioning constituted an interrogation for purposes of *Miranda*. Accordingly, the only question before the Court is whether Morris was in custody at the time of questioning.

Several factors guide the Court's inquiry in determining whether Morris was in custody for purposes of *Miranda*. These include: the location of the interview; the length and manner of questioning; whether he possessed unrestrained freedom of movement during the interview; and whether Morris was told he was not required to answer the questions. *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009). For the reasons explained in the Magistrate Judge's R&R, this is not a close question.

First, the interview took place over the phone. Morris cites two cases in which a custodial interrogation was found based on a telephone interview. However, the circumstances in those cases were vastly different than in the case at bar. In *United States v. Adoni-Pena*, 2009 WL 3568488 (D. Vt. Oct. 23, 2009), the phone interrogation took place in a police station hallway after the defendant had been placed in an interrogation room. The court observed that the defendant was given no indication he could decline to talk to the questioning officer or that he could leave the police station.

In *United States v. Arango-Chairez*, 875 F. Supp. 609 (D. Neb. 1994), the telephone interrogation took place while the defendant was incarcerated. An INS agent called the defendant while he was in custody at the county jail and questioned him for about five minutes. *Id.* at 611. The court determined that he was in custody for purposes of *Miranda* because the defendant had not been informed that the questioning was voluntary, was not free to leave, and neither initiated contact with authorities nor voluntarily acquiesced to questioning.

Here, Morris was not in a custodial environment but was in a hotel room thousands of miles away from the agents with whom he was speaking. The Court is unpersuaded by Morris's argument that he felt unable to end the call because agents were in his home with his wife. First, it was Morris's idea to conduct the interview in this manner, and his wife agreed.

Morris's wife remained on one side of the kitchen counter and the agents on the other—at no time did the agents block her path to exit the room. The tone of the interview was cordial and at times even casual. Agents reasonably assumed that the interview was voluntary since Morris invited them to his home to talk. Near the end of the interview, when Morris struggled to provide certain answers, Special Agent Laber advised him that "it was okay if he didn't want to answer a question" but he was required to be truthful if he did answer. [Record No. 30, p. 13]

Next, the Court is unpersuaded by Morris's suggestion that the statements were not made voluntarily because he was suffering from jet lag and/or because the interview took place late at night in the time zone where he was located. [Record No. 32, p. 8] The Court reiterates that Morris initiated telephone contact with Special Agent Laber and invited the agents to come to his home to conduct the interview. Further, the interview lasted only an hour and twenty minutes. Laber testified that Morris's memory did not seem foggy and that he gave answers that were responsive to questions that contained very particular details, such as names of people, dates, and dollar amounts. [Record No. 30, p. 12] Morris's conclusory assertions regarding jet lag and the time of day the interrogation took place do not render the statements involuntary.

Finally, with respect to suppression, Morris contends that the statements made on September 12, 2018, should be excluded as unreliable because the government has not produced extrinsic evidence (i.e., Morris's bank and tax records) corroborating his statements. Morris correctly notes that admissions of a criminal defendant generally must be corroborated by independent evidence to ensure their reliability. *See Opper v. United States*, 348 U.S. 84, 90 (1954). But the government is not required to introduce its trial evidence at this stage of

proceedings in an effort to corroborate Morris's statements to investigators. As previously explained, Morris's statements were voluntarily given and he has not identified any reason for excluding their introduction at trial. It will be left to the jury to determine how much weight to give them based on the corroborating evidence (or lack thereof) and all other relevant factors.

### III.

#### A.  Abstention

Morris contends that Counts 1 through 3 of the indictment should be dismissed based on "the Abstention Doctrine." Following the Magistrate Judge's thorough explanation of various abstention doctrines, Morris now contends that a "*Burford*-type abstention" applies in this matter. *Burford* allows a federal court to dismiss a case only if it presents "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case at bar" or if adjudication in a federal forum "would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *Cleveland Hous. Renewal Project v. Deustche Bank Trust Co.*, 621 F.3d 554, 562 (6th Cir. 2010) (quoting *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 726-27 (1996) (discussing abstention under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943)).

Abstention is a limited exception to the virtually unflagging obligation of federal courts to exercise the jurisdiction given to them. *MacDonald v. Village of Northport, Mich.*, 164 F.3d 964, 968 (6th Cir. 1999). Essentially, Morris contends that Counts 1 through 3 concern his alleged failure to pay his state income taxes and, therefore, should be left to the Commonwealth of Kentucky to resolve. However, the indictment alleges that he engaged in a scheme to defraud the Kentucky Department of Revenue and used interstate wire communications to do

so in violation of 18 U.S.C. § 1343.  Morris has not explained why these allegations concern "difficult questions of state law" or why adjudication of the charges in this court would be disruptive of any state policy efforts.

As the Magistrate Judge explained, Morris's reliance on *United States v. State of Ohio*, 614 F.2d 101 (6th Cir. 1979) is not persuasive.  There, various governmental agencies had entered into contracts with private corporations in which contractors were required to purchase items of personal property on behalf of the United States.  The Tax Commissioner of Ohio subsequently levied sales and use tax assessments against the contractors.  Three of the four government contractors challenged the tax assessments before the Ohio Board of Tax Appeals.

The United States Attorney for the Southern District of Ohio subsequent filed a complaint in that district alleging that the taxes assessed against the contractors were improper under Ohio law.  The United States sought a declaration under 28 U.S.C. §§ 1345 and 2201.  However, the district court stayed the matter, concluding that the United States appeared to have a pecuniary interest in the proceedings before the Board of Tax Appeals.  The Sixth Circuit concluded that the district court was correct to abstain because the questions, which primarily involved state tax law, were already pending in state court against the same defendants.

Here, the United States does not seek a declaration that Morris violated Kentucky income tax laws and there is no pending state proceeding involving the same subject matter.  Instead, Morris is accused of violating a federal criminal statute which is independent of state law.  Accordingly, his motion to dismiss Counts 1 through 3 based on abstention principles will be denied.

### B. Department of Justice Policy

Morris argues that Counts 1 through 3 should be dismissed based on a purported DOJ Tax Division Directive which states, "[a]bsent unusual circumstances . . . the Tax Division will not approve mail or wire fraud charges in cases involving only one person's tax liability." However, Morris has not identified any authority indicating that internal DOJ policy confers any rights on the accused. *See United States v. Myers*, 123 F.3d 350, 355-56 (6th Cir. 1997) (holding that a violation by the DOJ of its internal operating procedures, on its own, does not create an enforceable right); *Zepeda v. United States*, 2013 WL 599869, at *2 (C.D. Cal. Feb. 15, 2013) (DOJ policy manuals do not create substantive or procedural rights on which federal criminal defendants may rely); *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141 (D.D.C. 2006) (DOJ guidelines do not create legally enforceable rights). Accordingly, Morris's motion to dismiss based on DOJ policy will be denied.

### C. Public Policy

Morris also asserts that Counts 1 through 3 should be dismissed on public policy grounds. Again, he contends that these counts concern his alleged failure to pay state income taxes and the mere incidental use of interstate communications in transmitting documents to H&R Block does not constitute a sufficient interstate nexus to exercise federal jurisdiction in this case.

Contrary to Morris's assertion, the United States has adequately alleged that the use of interstate wire communications (i.e., the internet) was at least "incident to an essential part of the scheme" or "a step in the plot." *See Schmuck v. United States*, 489 U.S. 705, 710-11 (1989). While Morris points out that the tax filings could have been submitted by other means, the

indictment sufficiently alleges Morris's use of interstate wires was incidental their submission, which was an essential part of the alleged scheme.

Morris relies on the Second Circuit's decision in *United States v. DeFiore*, but the majority's opinion in that case supports denial of his motion. 720 F.2d 757 (2d Cir. 1983). Defendant DeFiore and two others were convicted of a scheme to defraud the New York Department of Taxation and Finance. Each count was based on a separate phone call in furtherance of a scheme to deprive the state of New York of tax revenue due to the sale of cigarettes. On appeal, DeFiore argued that the wire fraud statute was not intended for the prosecution of schemes designed to violate *state* tax laws. The Second Circuit found "no room for agreement with DeFiore," observing that Section 1343 plainly applies to any scheme or artifice to defraud in which interstate wires are employed. *Id.* 761-62. Further, Congress clearly had authority to regulate such misuse and the fact that the state was the victim was of no consequence.

Morris's reliance on Judge Winter's partial dissent in *DeFiore* is unpersuasive. Judge Winter believed that the government only proved a single scheme to defraud, but charged each use of the wires as a separate count. He believed "some line drawing [was] in order," as criminal liability should not be so dependent upon the number of phone calls or wire transmissions made. Here, while the government has charged a single scheme to defraud, each of the three counts is based on a separate tax year and separate document allegedly signed and submitted by Morris on separate dates.

Additionally, Morris's characterization of *United States v. Hartsell*, 199 F.3d 812 (6th Cir. 1999), as analogous is simply inaccurate. In *Hartsell*, the defendant was convicted of mail fraud based on a scheme to defraud *via* diversion of charity fund monies. However, the Sixth

Circuit determined that the mere receipt of bank statements did not satisfy "use of the mails" as required for the mail fraud statute, 18 U.S.C. § 1341. Rather than being a mere passive recipient of the statements, the government was required to show that the bank statements were necessary to the success of the scheme or that they were used to aid or further the scheme in some way. 199 F.3d at 816-17. Here, in contrast, the government alleges that Morris *actively used* the internet, in interstate commerce, to submit falsely completed tax forms to the Kentucky Department of Revenue.

Morris has not identified any public policy grounds for dismissing Counts 1 through 3 of the indictment and this portion of the motion will be denied.

### D. Constitutional Grounds—Failure to State an Offense

An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged. . . . For each count, the indictment or information must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated." Fed. R. Crim. P. 7(c)(1). The Sixth Amendment to the United States Constitution provides a defendant with the right to be informed of the nature and cause of the accusations against him. *United States v. Maney*, 226 F.3d 660, 663 (6th Cir. 2000).

The United States Supreme Court has explained that an indictment passes constitutional muster "if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Id.* (quoting *Hamling v. United States*, 418 U.S. 87 (1974)). To be legally sufficient, the indictment must include facts and circumstances which constitute an offense and, if proved, would establish prima facie the

defendant's commission of the crime. *Id.* at 663; *United States v. Landham*, 251 F.3d 1072, 1079 (6th Cir. 2001).

The elements of wire fraud under 18 U.S.C. § 1343 are: (1) a scheme or artifice to defraud; (2) use of interstate wire communications in furtherance of the scheme; and (3) intent to deprive a victim of money or property. *United States v. Faulkenberry*, 614 F.3d 573, 580-81 (6th Cir. 2010). Morris argues that Counts 1 through 3 of the indictment are constitutionally defective because they do "not specify the amount of income taxes actually paid by Mr. Morris to the State of Kentucky, the IRS, or the Chinese government during the applicable years." Specifically, he speculates, if Morris "significantly overpaid taxes to the States of Kentucky during the relevant years, it [is] possible no additional taxes would be owing had he properly reported all of his foreign income." [Record No. 32, p. 21]

The United States has sufficiently alleged the elements of wire fraud. As the Magistrate Judge pointed out, the indictment alleges specifically: "Morris understood that by falsely representing his income to the Kentucky Department of Revenue, he was depriving that department of information that, had it been provided, would have resulted in his owing substantially more money in taxes to the state of Kentucky." [Record No. 1, ¶ 19] While an indictment must give the defendant sufficient notice of the charges against him, it is not required to anticipate or negate potential defenses. *See United States v. Titterington*, 374 F.3d 453, 456-57 (6th Cir. 2004).

The United States was not required to allege the charges with any greater detail in the indictment and Morris has not produced any caselaw that supports this contention.

### E.     Disclosure of Grand Jury Minutes

Morris contends that the grand jury minutes should be disclosed to determine whether the grand jury was advised of the amount of taxes he paid to the State of Kentucky, the IRS, and the Chinese government during the applicable tax years. He asserts that dismissal of the indictment is warranted if this information was not presented to the grand jury.

The Magistrate Judge correctly concluded that Morris's desire for this information does not constitute a compelling necessity that overcomes the presumption of grand jury secrecy. *See* Fed. R. Crim. P. 6(e)(2)(E)(ii); *In re Grand Jury 89-4-*72, 932 F.2d 481, 483 (6th Cir. 1991). As explained in the previous section of this opinion, Morris's alleged transmission of statements falsely omitting his earnings as a professional basketball player during the relevant years is sufficient factual support for the charges alleged. While Morris may seek to introduce evidence at trial demonstrating that he overpaid state income taxes and, therefore, did not intend to deprive Kentucky of money or property, he has not shown that the indictment is deficient or that there is any valid basis for disclosing minutes from the grand jury proceedings.

### IV.

Based on the foregoing analysis and discussion, it is hereby

**ORDERED** as follows:

1.     The Magistrate Judge's Report and Recommendation [Record No. 31] is **ADOPTED** and **INCORPORATED** here by reference.

2.     Defendant Randolph Morris's motion to suppress, dismiss, and/or disclose grand jury materials [Record No. 20] is **DENIED**.

- 13 -

Dated: August 27, 2021.

*Danny C. Reeves*, Chief Judge
United States District Court
Eastern District of Kentucky